Filed 9/10/14  P. v. Cisneros CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD RAMON CISNEROS et al.,<br><br>    Defendants and Appellants. | E058626<br><br>(Super.Ct.No. FWV900532)<br><br>**OPINION** |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Sachs, Judge.  Affirmed as modified.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant, Edward Ramon Cisneros.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant, Joel Jaquez.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina, and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendants Edward Ramon Cisneros and Joel Anthony Jaquez entered a Papa John's Pizza (PJP) on Central Avenue in Chino at closing time. Silvio Guiral was the only employee in the store. Defendants demanded Guiral's money from his wallet, his personal keys and keys to the PJP's safe. They threatened Guiral with a gun. Unbeknownst to defendants, a woman outside the store had seen them enter the restaurant and immediately called the police. Numerous Chino police officers arrived and eventually Jaquez engaged them in a shootout. Jaquez and Cisneros were shot, along with an officer. Additionally, during the clash, an innocent bystander was shot and killed by an officer.

Defendants were charged in a 14-count information with murder, four counts of attempted murder, four counts of assault with a firearm on a peace officer, kidnapping to commit robbery (which was dismissed prior to going to the jury), two counts of robbery, burglary and making criminal threats. They were also charged with numerous firearm enhancements. Jaquez was found guilty of all the charges and the enhancements except for murder and two counts of attempted murder. Cisneros was also found guilty of all of the charges and enhancements except murder and three counts of attempted murder.[1]

---

[1]    We will discuss the jury verdict in more detail, *post*.

Defendants individually and collectively contend on appeal as follows:

1. Cisneros contends that there was insufficient evidence presented to support his convictions of attempted unpremeditated murder of a police officer and assault with a firearm on a police officer.

2. Cisneros and Jaquez contend that they could not be convicted of two counts of robbery against a single victim.

3. If they were properly convicted of the two counts of robbery against a single victim, one of the counts must be stayed pursuant to Penal Code section 654.[2]

4. Section 654 requires that their sentences on their convictions for making terrorist threats (§ 422) and commercial burglary (§ 459) must be stayed.

5. The restitution fines imposed pursuant to section 1202.4, subdivision (b) and parole revocation fines pursuant to section 1202.45 must be reduced.

We strike one of the convictions of robbery for both Jaquez and Cisneros. We also stay the sentence on their convictions of making terrorist threats and commercial burglary. We otherwise affirm the judgment.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

3

# I

## PROCEDURAL BACKGROUND

After a joint trial, Jaquez was found guilty of the attempted murders (§§ 664/187, subd. (a)) of Chino Police Officers Nicholas Mutrux (count 2) and David Villaran (count 4). For count 4, the jury found true the special allegations that the murder attempted was premeditated and deliberate, and that he discharged a firearm and personally used a firearm (§ 12022.53, subds. (b) & (c)). Jaquez was also found guilty of assault with a firearm on a peace officer (§ 245, subd. (d)(1)) against Officers Mutrux (count 3); Villaran (count 5); Charles Paul (count 7); and Rodney Tamparong (count 9). For counts 2 and 3, the jury found true the special allegations that he personally and intentionally discharged a firearm that caused great bodily injury and death (§ 12022.53, subd. (d)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and personally used a firearm (§ 12022.53, subd. (b)). For counts 5, 7, and 9, the jury found that Jaquez used a firearm and discharged a firearm (§ 12022.53, subds. (b) & (c)). In addition, Jaquez was found guilty of two counts of robbery against Silvio Guiral (§ 211; counts 11 & 12); second-degree commercial burglary (§ 459; count 13); and making criminal threats (§ 422; count 14).[3] For counts 11 and 12, the jury found true the allegations that Jaquez personally used a firearm (§ 12022.53, subd. (b)). For counts 13 and 14, the jury found the firearm use allegations (§ 12022.5.subd. (a)) true.

---

**3** The information initially charged Jaquez and Cisneros in count 12 with robbery against PJP but was later amended to name Guiral as the victim.

The jury was deadlocked on a charge of murder of Daniel Balandran (count 1); the attempted murders of Officers Paul and Tamparong (counts 6 & 8); and the special allegation for count 2 that the attempted murder was premeditated and deliberate. Those counts were dismissed in the interests of justice.[4]

Cisneros was found guilty of the attempted murder (§§ 664/187, subd. (a)) of Officer Villaran (count 4); assault with a firearm (§ 245, subd. (d)(1)) on Officers Villaran, Paul, Tamparong and Mutrux (counts 3, 5, 7, & 9); two counts of robbery (§ 211) against Guiral (counts 11 & 12); burglary (§ 459; count 13); and making criminal threats (§ 422; count 14). For counts 11 and 12, the jury found true the allegations that Cisneros personally used a firearm (§ 12022.53, subd. (b)), and for counts 13 and 14 that he used a firearm (§ 12022.5, subd. (a)). The jury was deadlocked on counts 1, 2, 6, and 8, and the special allegation of premeditated and deliberate murder on count 4. A mistrial was declared on these counts. The charges were dismissed in the interests of justice.

After a court trial, the evidence established that Jaquez had suffered two prior convictions within the meaning of section 667.5, subdivision (b). The trial court also found true that Cisneros had suffered one prior serious felony conviction (§ 667, subd. (a)(1)); one prior serious or violent felony conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)); served one prior prison term for a violent conviction (§ 667.5, subd. (a)); and two other prior prison terms (§ 667.5, subd. (b)).[5]

---

[4]     Prior to trial, the trial court granted Jaquez's motion to dismiss count 10 pursuant to section 995.

[5]     Trial on the prior convictions was bifurcated.

Jaquez was sentenced to a total determinate sentence of 75 years and 4 months, followed by an indeterminate term of 47 years to life. Cisneros was sentenced to a total determinate term of 51 years plus an indeterminate term of 14 years to life.

II

FACTUAL BACKGROUND

A. *People's Case-in-Chief*

1. *Entry and robbery at PJP (Counts 11-14)*

On February 1, 2009, Silvio Guiral was the general manager at the PJP located on Central Avenue in Chino. At approximately 9:45 p.m., he turned off the "OPEN" sign and locked the door. He was the sole employee in the store. He began the process of closing the store. He then heard a loud banging noise.

Guiral turned around and saw two men, identified as Cisneros and Jaquez, approaching him. Cisneros was wearing a black hooded sweatshirt and dark jeans. Jaquez had his face covered with a bandana and was holding a gun. He also was wearing dark jeans and a black hoodie. Both Cisneros and Jaquez told him several times that if the police came, they would kill him.

Cisneros and Jaquez told Guiral to give them his own money, the keys to the PJP's safe, and his cellular telephone. They moved Guiral to the manager's office. Guiral gave them $80 of his own money and a set of keys, which contained his own keys and keys belonging to PJP. Guiral advised them he did not have his cellular telephone.

Cisneros grabbed Guiral by the collar and took him into the restroom. He directed Guiral to lie down on the floor. Jaquez gave the gun to Cisneros. Cisneros held the gun

6

on Guiral and told him, "to not look at me or I'll shoot you, I'll kill you, look down." Gurial feared for his life.

The PJP's safe had two sections. One section required a key in order to open it, but the other section required a code to open the safe. The code was on a time delay. Guiral estimated there was $1,200 total in the safe when defendants entered the PJP. Jaquez asked for the code to the safe. Guiral gave him the code but advised him of the time-delay device.

Both defendants left the bathroom and went to the front of the store. Guiral saw both defendants putting money in bags. One of the defendants shut the bathroom door. Guiral then heard gunshots and sirens and remained in the bathroom until officers helped him out.

2. *Shootout with Chino police officers (counts 1-9)*

At around 9:45 p.m., Irma Sanchez Acuna was sitting in her car outside the PJP waiting for her husband, Aurelio Neria, who delivered pizzas for PJP to return from a delivery. She observed two people dressed in dark pants and black jackets approach the door of the PJP. They covered their faces and pushed open the front door of the PJP. Irma found this "mysterious" and thought they intended to rob the store. She called 911.

Chino Police Officer Andrew Bjelland responded to the PJP at 10:13 p.m. Officer David Villaran also responded. Officer Villaran approached the front door of the PJP and peeked inside the window of the store. He saw a person wearing a black hoodie approaching the doorway. The person made eye contact with Officer Villaran and moved to the back of the store.

7

Officer Bjelland looked through a peephole in the back door of the PJP and observed a man in a black hooded sweatshirt with a bandana covering his face and holding a handgun. The man moved toward the rear door and opened it a small amount. Officer Bjelland, who had moved to the side of the door, yelled "Police. Drop the gun." The door closed and the suspect went back into the PJP.

Officer Villeran hid behind a parked car near the front door of the PJP. He observed Cisneros and Jaquez move quickly toward the front door. Jaquez was holding the handgun. He looked directly at Officer Villaran. Jaquez exited the store and began firing at Villaran. Officer Villaran returned fire and emptied his weapon which contained 13 bullets. He reloaded his gun and resumed firing.

Officers Nick Mutrux, Charles Paul and Rodney Tamparong all positioned themselves on the northwest corner of the PJP. The officers saw Jaquez running on the north side of the PJP toward them. Jaquez ran within three to four feet of the officers. He appeared startled when he saw the three officers. Jaquez extended his arm and shot two or more times directly at them. The officers returned fire. Jaquez stumbled and fell to the ground.

Officer Mutrux was shot in the right forearm. It shattered his bones and he had to have surgery on his arm. He had a lengthy scar from the surgery. A second spent bullet was recovered from Officer Mutrux's bulletproof vest. He had an abrasion and burn mark on his abdomen from the bullet hitting the vest.

Officer Bjelland heard the gunshots and ran toward the front of the store. He observed Jaquez running and shooting at Officers Mutrux, Tamparong and Paul. Officers

8

Mutrux, Tamparong and Paul were all shooting at Jaquez and yelled that they had emptied their guns. Jaquez had been shot multiple times. A handgun was recovered near him.

Meanwhile, Cisneros remained in the PJP. Officer Villaran fired into the PJP and Cisneros took cover under the counter. Officer Villaran yelled numerous times to Cisneros to exit the store but he refused. A police dog was sent into the store to drag him out. When the police dog was unsuccessful, officers entered the store. He was found hiding behind the counter and had money in his pocket. A trash bag containing money was also found near him. Cisneros suffered several gunshot wounds to his upper torso and face. He lost part of his pinky finger as a result of a gunshot wound. No other gun was found in the PJP.

While the shootout was occurring, one of the Chino police officers mistakenly believed that an innocent bystander running from the gunfire was one of the suspects and shot him. The man, Daniel Balandran, died at the scene.[6] Defendants presented no evidence.

---

[6] The details of the shooting are not relevant to the issues raised on appeal as the jury was deadlocked on count 1 and the charge was dismissed in the interests of justice.

# III

## INSUFFICIENT EVIDENCE OF ATTEMPTED MURDER AND ASSAULT WITH A FIREARM ON A PEACE OFFICER

Cisneros claims he was wrongfully convicted of committing the attempted unpremeditated murder of Officer Villaran (count 4) and assault with a firearm on Officers Mutrux, Villaran, Paul, and Tamparong (counts 3, 5, 7 and 9). He argues that Jaquez's independent action of engaging in a shootout with officers was not a natural and probable consequence of the intended robbery of the PJP.

### A. *Standard of Review for Sufficiency of the Evidence Claims*

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there

sufficient substantial evidence to support [the conviction].'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

B.     *Analysis*

"'"A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime."' [Citations.] "Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." [Citation.]'" (*People v. Chiu* (2014) 59 Cal.4th 155, 161.)

"A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.]" (*Chiu, supra,* at pp. 161-162.)

"The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the policy [that] . . . aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put in motion.' [Citation.]" (*Chiu, supra,* at pp. 164-165.) "For a criminal act to be a 'reasonably

11

foreseeable' or a 'natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act. For example, murder is generally found to be a reasonably foreseeable result of a plan to commit robbery and/or burglary despite its contingent and less than certain potential. [Citations.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 530.)

"The determination whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant requires application of an objective rather than subjective test. [Citations.] . . . [T]he issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. [Citations.]" (*People v. Nguyen, supra,* 21 Cal.App.4th at p. 531; see also *Chiu, supra,* 59 Cal.4th at p. 162.)

Here, the jury was instructed that it must first determine whether Cisneros was guilty of the robberies inside the PJP, the burglary and making criminal threats. It was instructed it must then determine if he was also guilty of the attempted murders and assault with a firearm on the four officers. It was then instructed, "During the commission of the crimes charged in Counts 11, 12, 13 and 14, a coparticipant in those crimes committed the crimes of attempted murder of a police officer and/or assault with a firearm on a police officer. And under all the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder of a police officer and assault with a firearm on a police officer was a natural and probable consequence of the commission of the crimes charged in Counts 11, 12, 13 and 14."

12

Here, the evidence showed that Cisneros and Jaquez entered the PJP by forcing their way through the locked door. Jaquez was carrying a handgun that was in plain sight to Guiral. Both Cisneros and Jaquez were aware that the police could arrive as they threatened to kill Guiral if the police showed up. Both Cisneros and Jaquez forced Guiral to give them his keys and money. Jaquez gave the gun to Cisneros, who pointed it at Guiral and threatened to kill him if he looked at his face. Cisneros clearly was aware of the presence of the gun and was not afraid to use it to further his and Jaquez's goal of robbing the PJP.

Thereafter, the police arrived. Both suspects remained in the PJP. Officer Villaran stated that both defendants approached the door. Jaquez then looked him directly in the eye and shot at him. Jaquez then shot at Officers Villaran, Mutrux, Paul and Tamparong while trying to run away. Cisneros did not exit the store, but rather hid until he was forcibly removed by the officers.

Cisneros involved himself in an armed robbery with Jaquez. Cisneros and Jaquez used the gun to rob the PJP. It was reasonably foreseeable that the police would arrive and that Jaquez would use the gun against the officers in order to secure their escape.

Cisneros relies upon the ninth circuit case of *U.S. v. Andrews* (9th Cir. 1996) 75 F.3d 552. In *Andrews*, the defendant and his associate armed themselves and went to attack a particular person, with whom one of them had previously argued. The defendant killed the intended target. However, the associate thereafter shot two different people who had been with the victim, killing one of them. (*Id.* at p. 554.) The court reversed the defendant's murder conviction as an aider and abettor because there was no evidence the

13

defendant knew his confederate was going to shoot anyone other than the person involved in the argument. (*Id.* at pp. 555-557.)

Initially, Ninth Circuit authority is not binding on this court. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1292.) Nonetheless, this case is distinguishable from *Andrews*. Cisneros and Jaquez both used the gun during the robbery and both threatened to kill Guiral if the police arrived. Cisneros was aware that the police could arrive during the armed robbery, and could reasonably foresee that one of them would engage the officers in a gunfight in order to escape.

Based on the foregoing, substantial evidence supported Cisnero's convictions of the attempted murder of Officer Villaran, and assault with a firearm on Officers Villaran, Paul, Mutrux and Tamparong.

IV

ROBBERY CONVICTIONS

Both Cisneros and Jaquez contend that they were improperly convicted of both counts 11 and 12 because they both involved the robbery of Guiral. Respondent concedes that one of the convictions must be stricken as the robberies involved one victim during an indivisible course of conduct.

As noted in footnote two, *ante*, defendants were originally charged in count 12 with robbery against PJP. Prior to trial, the prosecutor amended the information to strike PJP as the victim and insert Guiral. The prosecutor argued in closing as to the two robberies, "Count 11 is for the robbery of the personal items from Mr. Guiral. Count 12 is the robbery of the items of the Papa John's."

14

A.    *Analysis*

"'Robbery is the felonious taking of personal property in the possession of another from his person or immediate presence, and against his will, accomplished by means of force or fear.'" (§ 211.)  Robbery "consists of larceny plus two aggravating circumstances:  (1) when the property is taken from the person or presence of another, and (2) when the taking is accomplished by the use of force or threatened force. [Citation.]"  (*People v. Marquez* (2000) 78 Cal.App.4th 1302, 1308 (*Marquez*).)

"California follows 'the traditional approach that limits victims of robbery to those persons in either actual or constructive possession of the property taken.'  [Citation.] '"Robbery" is an offense against the person [.]'  [Citation.]  Accordingly, a victim can be any person who shares 'some type of "special relationship" with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner.'  [Citation.]  Persons with just such a special relationship include business employees . . . [Citations.]"  (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064-1065.)  Guiral possessed the money in the PJP safe as an employee of PJP.

In *People v. Bauer* (1969) 1 Cal.3d 368, the Supreme Court explained that "where a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking of the other items is not permissible."  (*Bauer, supra,* 1 Cal.3d at p. 377.)

15

In *Marquez, supra,* 78 Cal.App.4th 1302, the court took this one step further in prohibiting multiple convictions. In *Marquez*, the defendant was charged and convicted of two robberies at a restaurant against one victim because he took the victim's personal tip money and the money from a cash register. On appeal, the court applied the single larceny doctrine to find that defendant was erroneously convicted of the two counts of robbery. (*Marquez, supra,* 78 Cal.App.4th at p. 1307.) The court explained, "In one seamless ill-conceived effort, [the] defendant walked up to the counter at [a][r]estaurant, threatened [the] waitress . . . with a handgun, thereby convincing her to hand over her tips lying on the counter and [the restaurant's] operating money from the cash drawer. This was an indivisible transaction involving a single victim who was forced to relinquish possession of two separately owned amounts of money at the same place and at the same time." (*Ibid*.)

This case is indistinguishable from *Marquez*. Defendants demanded that Guiral give them his own personal money and his key ring, which contained both his personal keys and the keys to PJP's safe. This was all committed in one indivisible course of conduct. Like in *Marquez*, the fact that the property taken belonged to both Guiral and the PJP was of no consequence. We will strike defendants' convictions in count 12.[7]

---

**7**      Jaquez was sentenced to four years and four months on count 12. Cisneros was sentenced to five years and four months on count 12.

Cisneros also points out that if we strike one of the robbery convictions, the fines for that count must be reduced.[8]  Both Jaquez and Cisneros were ordered to pay a $40 court security fee pursuant to section 1465.8 on count 12, and a $30 criminal conviction fee pursuant to Government Code section 70373.  We shall order that the total fines be reduced by this amount.

V

654 STAY

Cisneros and Jaquez contend they could not be sentenced on both robberies (counts 11 and 12), burglary (count 13) and criminal threats (count 14) pursuant to section 654.  We have reversed count 12 and find defendants were properly sentenced on count 11 for the single robbery.  We agree that counts 13 and 14 should have been stayed.

A.    *Additional Factual Background*

During closing argument, the prosecutor argued that count 14, the charge of making criminal threats, was committed by Cisneros, who threatened Guiral with death. Cisneros made the threat while Guiral was cowering in the corner fearing for his life. The prosecutor argued, "They wanted his cooperation.  They wanted to threaten him to ensure that."  The prosecutor argued that Jaquez aided and abetted the threat.  Further, the prosecutor argued, "That threat is what prompted Mr. Guiral to turn over the keys and the money out of his pockets."  The prosecutor argued, "They were working together and

---

[8]    Cisnero, joined by Jaquez, also argues that the restitution fine imposed pursuant to section 1202.4 should be reduced by $280.  As discussed *post*, the restitution fine was properly imposed and not necessarily based on each conviction.

they utilized that threat to get what they wanted, which was access to that safe." For the burglary, the prosecutor advised the jury that he only need to prove that the defendants entered the PJP and that they did so to commit a theft or robbery. The prosecutor stated it had been shown beyond a shadow of doubt that there was a robbery.

The prosecutor argued at sentencing that counts 11, 12, 13 and 14 should run consecutive to the other counts because the counts involved different victims. He also argued that section 654 did not bar consecutive sentences on counts 11, 12, 13 and 14. The prosecutor argued the burglary of PJP was completed when the defendants entered the PJP. Thereafter, Guiral was personally robbed. The prosecutor argued that the terrorist threats came after the money was already taken from Guiral.

Cisneros argued that these counts should be stayed because there was only one intent to commit robbery and it was not complete. These acts were all part of a continuous course of conduct. The prosecutor responded that these were separate and distinct crimes. The trial court stated, "As to . . . counts 11, 12, 13 and 14, I am of the belief that they are in fact separate offenses."

Jaquez was sentenced on count 11 to four years and four months; on count 13 to four years; and on count 14 to four years. The sentences were ordered to run consecutive to each other and the other counts. Cisneros was sentenced on count 11 to five years and four months; on count 13 to four years and eight months; and on count 14 to four years and eight months. The sentences were to run consecutive to each other and the other counts.

B.      *Analysis*

Section 654 provides "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  "[S]ection 654 prohibits punishment for two crimes arising from a single indivisible course of conduct.  [Citation.]  If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once.  [Citation.]  If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.  [Citation.]  The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.  [Citation.]"  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

It has long been held that the trial court may not sentence a defendant for burglary and the underlying felony where entry was for the purpose of accomplishing the underlying felony.  (See *People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336.)

Initially, as to the burglary,[9] there is no dispute that defendants entered the PJP with the intent to commit robbery. As set forth, *ante*, we have reversed count 12, finding that the taking of property from Guiral's presence, whether it belonged to PJP or Guiral, all constituted one robbery. Defendants could be properly sentenced on count 11 consecutive to the remaining counts.

The People, despite conceding that count 12 must be reversed, argue that section 654 did not mandate that count 13, the burglary, be stayed because defendants entered the PJP with the intent to rob the PJP, and once they entered the PJP, the burglary was complete. However, once inside, they subsequently robbed Guiral of his personal property which amounted to a separate intent and objective. Even assuming that this distinction can be made that the taking of PJP's property and Guiral's property can constitute separate intents and objectives, it simply cannot be concluded that when defendants entered the PJP, they only intended to take cash or property belonging to PJP. Since they entered right upon Guiral closing the store, they were aware an employee was inside. The evidence simply does not support that they only intended to take PJP property and money, but not to take anything from Guiral. The burglary sentence in count 13 must be stayed.

---

[9] Section 459 defines the crime of burglary as entry into "any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building . . . with intent to commit grand or petit larceny or any felony. . . ."

20

Defendants argue that the sentence on making of terrorist threats[10] in count 14 must be stayed because the threats were part of the robbery. They refer to the prosecutor's argument that the threats were made to make Guiral cooperate. They also cite to *People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, for the proposition that the prosecutor's argument can demonstrate the applicability of section 654.

In *People v. Perry, supra,* 154 Cal.App.4th at pp. 1526-1527, the court in addressing the applicability of section 654 for convictions of assault and burglary, found that "a conviction of assault committed during an escape with property taken during a burglary reflects, in essence, an intent to apply, attempt to apply, or threaten to apply force to a person, rather an intent to steal property. The objective of such an assault generally will be to deter, interrupt or put a stop to a pursuit or other effort to capture the defendant and any property taken during the burglary. However, if property is taken during a burglary and a robbery pertaining to the same property is committed during the escape, the objective is still essentially to steal the property. Admittedly, an additional objective of preventing the victim or another person from taking back the property generally will exist, but may be incidental to, rather than independent of, the objective of stealing the property." (*Id.* at pp. 1526-1527.) The *Perry* court further acknowledged that in some cases, the degree of force applied might show a separate intent. (*Id.* at p. 1527.)

---

**10**     Section 422 prohibits any person from willfully threatening to commit a crime that will result in death and great bodily injury to another person with the specific intent that the statement be taken as a threat and which results in the victim being in sustained fear for his or her own safety.

21

Similarly here, there was evidence that the making of terrorist threats had a separate objective of avoiding identification and an additional threat that was unnecessary to the commission of the robbery. However, in *People v. McKinzie, supra,* 54 Cal.4th 1302, the court found that despite evidence that the defendant harbored multiple objectives in committing carjacking and kidnapping for robbery, "defendant could not be punished for both carjacking and kidnapping for robbery because the prosecutor argued to the jury that the victim's car was the object of the robbery. [Citation.]" (*Id.* at p. 1369.) Here, the prosecutor argued that the threats were made to gain Guiral's "cooperation" and that "they utilized that threat to get what they wanted, which was access to that safe." Based on this argument, defendants could not be separately sentenced on count 14 and we will order it stayed pursuant to section 654.

VI

IMPROPER RESTITUTION FINES

Cisneros, joined by Jaquez, contend that the trial court did not impose the proper restitution fines. They contend that the trial court calculated the restitution fines by multiplying each conviction by $280, which was not the amount of the fine at the time they committed their crimes. At the time of sentencing, the trial court ordered that Jaquez pay a $2,800 restitution fine pursuant to section 1202.4 and parole revocation fee in the same amount pursuant to section 1202.45. It also stated as to Cisneros, "Regarding restitution fines, I'm going to impose the $2,520 restitution fine. And that's required pursuant to Penal Code section 1202.4." It imposed the same parole revocation fine. The trial court did not explicate the calculation of the restitution fines.

22

Effective January 1, 2013, the minimum restitution fine to be imposed pursuant to section 1202.4, subdivision (b) was increased to $280. (Stats. 2011, ch. 358, § 1.) On the date the crimes were committed, the minimum fine was $200. (Former section 1202.4, subd. (b)(1).) "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Defendants committed their crimes prior to the amendment of section 1202.4 and could claim an ex post facto violation if the trial court imposed the minimum restitution fine based on the amendment effective in 2013.

Initially, respondent contends that defendant has waived the claim by failing to object to the amount in the trial court. The failure to make a timely and meaningful objection forfeits or waives certain claims on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 351.) This includes "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons." (*Id.* at p. 356.) "The appropriate amount of restitution is precisely the sort of factual determination that can and should be brought to the trial court's attention if the defendant believes the award is excessive." (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [Fourth Dist., Div. Two].) Since defendants did not object to the amount of restitution, and as we find below, the fine was not unauthorized, they have forfeited the claim on appeal.

Defendants' restitution fines did not result in unauthorized sentences. The court had the discretion to lawfully impose the greater fine of $280 prior to the amendment to section 1202.4. The range of total restitution that could be ordered was between $200

23

and $10,000 at the time that defendants committed their crimes.  (Former section 1202.4, subd. (b)(1).)  Although it may be surmised that calculation in this case was based on the $280 fine multiplied by the number of convictions, it is not necessarily the case based on the silent record before this court.  There was no ex post facto error because the court imposed a lawfully authorized fine.

## VII

## DISPOSITION

We order that count 12 be stricken and that all attendant fines be stricken as set forth in the opinion.  The sentences on counts 13 and 14 shall be stayed pursuant to section 654.  The clerk of the superior court shall forward a modified abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.